Knox Glass Bottle Co. et al. [1] v. Commissioner. Knox Glass Bottle Co. v. Commissioner
Docket Nos. 33323, 33437, 33475-33477, 35755, 37292.
United States Tax Court
1953 Tax Ct. Memo LEXIS 107; 12 T.C.M. (CCH) 1071; T.C.M. (RIA) 53315; September 23, 1953
Norman D. Keller, Esq., Arnold R. Boyd, Esq., 60 Broadway, New York, N. Y., and Samuel J. Lasser, C.P.A., for the petitioners. Albert J. O'Connor, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income, declared value excess deficiencies in income, declared value excessprofits, and excess profits taxes for the year 1945 as follows: Declared Value
Excess-
Excess
Docket
Income
Profits
Profits
No.
Tax
Tax
Tax
33323
$2,272.13
$105,370.98
33437
99,734.12
33475
$24,581.92
62,455.57
33476
16,712.05
29,275.69
33477
46,474.07
53,461.81
35755
222,263.30
37292
102,233.91
*108 Docket No. 33477 also involves a deficiency in income tax for 1946 in the amount of $13,532.10. All of the petitioners, except Lincoln Glass Bottle Company, Docket No. 37292, seek relief under section 721 of the Internal Revenue Code. The contested issues are (1) whether the amounts received by petitioners in 1945 from the Hartford-Empire Company under a settlement agreement are taxable as ordinary income; (2) whether petitioners (excluding Lincoln Glass Bottle Company) are entitled to relief under section 721(a) (2) (A) of the Internal Revenue Code; and (3) whether a gain realized by Pennsylvania Bottle Company from an involuntary conversion is entitled to nonrecognition under section 112 (f) of the Internal Revenue Code. All other assignments were abandoned by the petitioners at the trial. The stipulated facts are found accordingly. Findings of Fact The petitioners, Knox Glass Bottle Co. (Pa.), Oil City Glass Bottle Company, Wightman Bottle & Glass Mfg. Company, Marienville Glass Company, and Pennsylvania Bottle Company were incorporated in Pennsylvania prior to 1931. The petitioner, Knox Glass Bottle *109 Company (Miss.), was incorporated in Mississippi in 1933. The petitioner, Lincoln Glass Bottle Company, was incorporated in Illinois in 1941. [2] Since the dates of their incorporation the petitioners have been engaged in the manufacture and sale of glass containers. Each petitioner kept its books and filed its income and excess profits tax returns on the accrual and calendar year basis. Pennsylvania filed its returns on the same basis for the years 1946 and 1948. The petitioners, Knox of Pennsylvania, Oil City, Wightman, Marienville, and Pennsylvania, filed their returns for the periods involved with the collector of internal revenue for the twenty-third district of Pennsylvania, at Pittsburgh, Pennsylvania. Knox of Mississippi filed its returns with the collector of internal revenue at Jackson, Mississippi. Lincoln field its returns with the collector of internal revenue at Springfield, Illinois. Hartford-Empire Company, hereinafter referred to as Hartford, is a Delaware corporation, and since *110 its organization has engaged in the business of manufacturing glass-working machinery and of licensing machinery and methods of manufacture of glassware. On June 6, 1928, Hartford instituted a suit in equity against Hazel-Atlas Glass Company, hereinafter called Atlas, in the United States District Court for the Western District of Pennsylvania, alleging that the operations of Atlas infringed the Peiler patent covering a method of and appartaus for feeding molten glass owned by Hartford. On February 28, 1930, the District Court dismissed the bill of complaint. 39 Fed. (2d) 111. Upon appeal, the United States Court of Appeals for the Third Circuit reversed the judgment with instructions to enter a decree holding Hartford's patent valid and the claims sued on infringed. 59 F. (2d) 399. Thereafter, in 1943, Atlas filed a petition with the Court of Appeals praying that it vacate and set aside its order of reversal and affirm the District Court, on the ground that the decision of the Court of Appeals was procured by fraud of Hartford. The petition was dismissed. 137 Fed. (2d) 764. A petition by Atlas for a writ of certiorari was granted on May 15, 1944. The *111 United States Supreme Court reversed the decision of the Court of Appeals with directions to set aside its prior judgment, recall its mandate and issue a mandate to the District Court directing it to set aside its judgment and enter judgment denying all relief to Hartford. 322 U.S. 238. On August 25, 1932, petitioners, Knox of Pennsylvania, Oil City, Wightman, Marienville and Pennsylvania, entered into a lease and license agreement with Hartford. Under such agreement, Hartford released the said five petitioners from all liability for claimed infringements of its patents in consideration of a payment of $100,000 in promissory notes and a transfer to Hartford of title to all feeders then owned by these five petitioners. The agreement contained restrictions as to the type and amount of glassware that could be manufactured thereunder. In 1940 Hartford abandoned all restrictions contained in the agreement. Under the agreement Knox of Pennsylvania became a licensee and lessee of Hartford. Marieville, Wightman, Pennsylvania and Oil City became sublicensees and sublessees of Knox of Pennsylvania. Knox of Mississippi became a sublicensee and sublessee of Knox of Pennsylvania *112 on April 12, 1933. The leases, licenses, subleases and sublicenses, with modifications, continued until October 31, 1945. Lincoln became a licensee and lessee of Hartford under agreements of November 4, 1942, which continued in effect until October 31, 1945. After October 31, 1945, Knox of Pennsylvania continued as lessee and licensee and the other petitioners, except Knox of Mississippi, continued as sublessees and sublicensees under the provisions of the hereinafter mentioned final judgment in the Government's antitrust suit. On June 28, 1946, Knox of Mississippi became a direct lessee and licensee. Between September 1, 1932, and August 31, 1942, all of the petitioners, except Lincoln, paid royalties to Hartford under the agreement of August 25, 1932, in the aggregate amounts as follows: Knox of Pennsylvania
$413,802.26
Oil City
244,724.91
Wightman
466,038.52
Marienville
429,477.98
Pennsylvania
401,789.58
Knox of Mississippi
599,582.36
In 1939 the United States instituted a civil action in the United States District Court for the Northern District of Ohio against Hartford and others under the federal antitrust laws. On August 25, 1942, the District *113 Court handed down an opinion in which it was held that Hartford and its codefendants had violated the antitrust laws by patent pooling and restrictive licensing. 46 Fed. Supp 541. On the same day the District Court issued an order under which a receiver was appointed to take over the assets of Hartford and to receive and collect Hartford's income due or to become due on and after September 1, 1942. The order, inter alia, further provided: * * * "Receipts from licensees are to be set aside and specially earmarked as coming from each licensee, and, upon confirmation by the Supreme Court of the decree to be entered herein, such receipts so collected and set aside are to be returned, without interest, to the various licensees." Pursuant to such order, each of the petitioners made rental and royalty payments to the receiver of Hartford. The aggregate royalties paid by each of the petitioners to the receiver from September 1, 1942, to October 31, 1945, were as follows: Knox of Pennsylvania
$184,344.29
Oil City
191,359.91
Wightman
200,338.42
Marienville
215,038.77
Pennsylvania
281,255.06
Knox of Mississippi
371,948.40
Lincoln
176,627.26
On *114 January 8, 1945, the United States Supreme Court affirmed the findings of fact and conclusions of law of the District Court to the effect that Hartford and its codefendants had violated the antitrust laws, but modified the decree in many respects. 323 U.S. 386. Upon petitioner of the United States for clarification of its opinion the Supreme Court on April 2, 1945, handed down a second opinion. 324 U.S. 570. In its second opinion the Supreme Court stated: * * * "Unless Hartford, since the entry of the decree by the District Court, has been guilty of some added violation of the anti-trust laws, licensees must elect (a) to remain licensees on such reasonable rental and royalty basis for the future as the District Court may fix, or (b) repudiate the leases and litigate their rights as against Hartford to retain any portion of the rents and royalties paid." * * * Subsequent to the second opinion of the Supreme Court a committee, known as the Committee of Non-Defendant Hartford-Empire Licensees, was formed to negotiate a plan with Hartford which could be recommended to the District Court as a reasonable and equitable basis of relationship between Hartford *115 and his licensees for the future. Roy Underwood, president of petitioners, was a member of the committee. Various meetings were held by the committee with licensees and representatives of Hartford. On or about August 22, 1945, Hartford made an offer to the committee which embodied certain objectives, terms, conditions and a summary. The objectives enumerated that Hartford sought to make available to the entire glass container industry a comprehensive program of engineering, research and development, to enable the industry to meet postwar competition of other types of containers, and asked, in return, reasonable financial resources with which to serve the industry The terms enumerated were: (1) royalty rates on feeders and rentals were to be reduced; (2) subject to due clearance with the appropriate tax authorities, Hartford agreed to return to licensees a cash refund in proportion to their respective payments of 60 per cent of the royalties due under the Hartford license contracts which were ordered earmarked by the District Court as of September 1, 1942, and held by the receiver as of October 31, 1945; (3) that Hartford would maintain its research and development program; (4) that *116 Hartford would make certain concessions in regard to length of license contracts; and (5) that Hartford would agree to furnish certain services at a reasonable charge. The offer of Hartford was subject to three conditions: (a) the offer was to be approved by the District Court; (b) all licensees were to agree to pay Hartford the proposed royalty rates for the use of its patented inventions; and (c) that "each licensee concurrently upon receipt of earmarked royalties pursuant to this offer is to execute appropriate covenants insuring Hartford against further litigation and claims on its part for past transactions. Hartford obviously cannot provide the industry with a worthwhile program of research and development if its energies and financial resources are to be dissipated in litigation." On August 22, 1945, the chairman of the committee of nondefendants transmitted a letter to the nondefendant licensees explaining the "proposal" worked out with Hartford. On September 21, 1945, the committee addressed a letter, designated "Circular Letter No. 9," to all licensees, requesting that the licensees immediately execute and return a form letter of notification enclosed therein, in order *117 to give the committee the necessary authority to conclude the negotiations and to present the matter to the District Court for its approval. Also enclosed was a form of covenant for later execution by the licensees. The form letter of notification reads in part as follows: "We have received your Circular Letter No. 3 dated August 22, 1945, to which was attached the Proposal of Hartford-Empire Company with respect to reduction of royalty rates for the future and related matters and to payments to the licensees of Hartford-Empire in consideration of a sign-off of claims for past transactions. "We have also received your Circular Letter No. 9 dated September 21, 1945, to which were attached forms of General Feeder Agreement and Covenant Not to Sue. "In pursuance of the opinions of the Supreme Court of the United States in the Hartford-Empire litigation: "1. We elect to remain a licensee of Hartford-Empire from November 1, 1945, for the period and on the rental and royalty basis and the other applicable terms and conditions set forth in the General Feeder Agreement above referred to and the other similar agreements to be executed covering Formers, Lehrs and Stackers presently *118 leased and licensed from Hartford-Empire. "2. We waive claim to any portion of the funds held by James A. Shanley, Receiver of Hartford-Empire, earmarked as coming from the undersigned. "3. We agree to execute and deliver to Hartford-Empire a General Feeder Agreement in the form submitted with respect to all feeders presently licensed and leased from Hartford-Empire, and to execute and deliver to Hartford-Empire substantially identical agreements (except as to applicable royalty schedules) with respect to all Forming Machines, Lehrs and Stackers, presently licensed and leased from Hartford-Empire. "4. Upon payment to us of an amount to be computed, (which for purposes of such computation only is designated as an amount equal to sixty percent (60%) of the balance of certain funds remaining in the hands of said Receiver of Hartford-Empire and earmarked as coming from us during the period from September 1, 1942 through October 31, 1945), we agree to execute and deliver to Hartford-Empire and its Receiver a Covenant Not to Sue in the form submitted to us with your Circular Letter No. 9 dated September 21, 1945. "Our election, waiver and agreements hereinbefore set forth are conditional *119 upon an order of court approving the foregoing and directing payment to us of the amount above referred to in consideration of a sign-off of claims for past transactions. "We authorize you, or a majority of you, to take all necessary steps to obtain court approval of the foregoing including intervention and appearance by you or your companies on our behalf in the Toledo case for the purpose of obtaining such court approval." On September 25, 1945, the committee notified all nondefendant licensees that it was imperative that the form letters of notification be returned by September 29, 1945, so that they could be filed by October 5, the last day on which the court would permit such action. The committee also stated that the refusal of one or more of the requisite licensees to sign would make it necessary to litigate the matter before the court. By written notices deposited with the committee on or about September 29, 1945, and later filed with the District Court, petitioners and the other nondefendant licensees, except 16 companies, accepted and approved an agreement made with Hartford by the Committee on their behalf. These notices were substantially the same as the forms earlier *120 distributed by the committee except some of these notices omitted the clause which stated that the claim to the earmarked funds was being "waived." The agreement was incorporated in an intervening complaint filed by six intervenors, including Knox of Pennsylvania, Buck Glass Company and Gayner Glass Works, in the antitrust action under date of October 5, 1945. The intervening complaint was filed on behalf of all of the nondefendant Hartford licensees electing to continue as such. The District Court issued an order to show cause, which was mailed to each person, firm or corporation who had paid money into the earmarked funds held by the receiver, along with a copy of the complaint, why the agreement made with Hartford by the committee should not be approved. On October 31, 1945, the District Court entered a final judgment in the antitrust suit against Hartford and approved the settlement. In accordance with the final judgment of the District Court 59 nondefendant licensees, including petitioners, executed and delivered to the receiver a covenant not to sue Hartford. On November 23, 1945, each petitioner received an amount equal to 60 per cent of the agreegate royalties paid *121 to the receiver. The amount received by each petitioner was as follows: Knox of Pennsylvania
$109,625.91
Oil City
124,355.83
Wightman
141,885.95
Marienville
148,980.56
Pennsylvania
170,008.03
Knox of Mississippi
265,285.61
Lincoln
104,306.66
During the course of the committee negotiations with Hartford it became known to the committee and the various licensees that some of the nondefendant licensees had claims against Hartford not arising out of the receivership. Despite such knowledge, the committee never discussed or considered any of the claims not arising out of the receivership. Hartford informed the committee that it would not enter into any settlement with any individual company which elected to continue as a licensee unless all of the companies electing to continue joined in the settlement. Petitioners did not assert any claim against Hartford under the antitrust laws at any time during the meetings and negotiations between the committee and Hartford which led up to the industry settlement offer of Hartford to the committee on August 22, 1945. On or about September 12, 1945, after the industry settlement offer made by Hartford was communicated *122 to the licensees at a meeting held at the Biltmore Hotel in New York City, petitioners objected to the form of the settlement papers, which were in the form of a general release. Petitioners stated they desired to preserve their right to sue Hartford's codefendants in the antitrust suit, and the form of the settlement papers was changed from a general release to a covenant not to sue Hartford and specifically reserving the right to sue Hartford's codefendants. Hartford did not enter into any settlement agreement with petitioners other than or different from the one contained in the documents constituting the general industry settlement agreement. In arranging for and participating in the settlement agreement, and in intervening in the antitrust action, the principal purpose and motive of the nondefendant licensees at all times was to make sure that Hartford was able to continue in the business of manufacturing and supplying glass working machinery to its licensees and was able to continue to act as a research, maintenance, and service organization for the benefit of the licensees. All of the petitioners, except Knox of Mississippi, sold their products to a distributor under exclusive *123 sales contracts. In its corporate income and excess profits tax returns for each of the taxable years 1932 to 1945, inclusive, each of the petitioners included the rental and royalty payments made to Hartford and to the receiver as a part of the cost of goods sold and these amounts were duly allowed by the respondent in arriving at net income. No part of the payments received under the settlement agreement was included in the gross income reported in the petitioners' income and excess profits tax returns for the taxable year 1945. During the taxable years 1941 to 1944, inclusive, Knox of Pennsylvania, Oil City, Wightman, Marienville, Pennsylvania and Knox of Mississippi received no income from a claim, award, judgment or decree, or from interest on the foregoing within the meaning of section 721 (a) (2) (A) of the Internal Revenue Code. Facts relating to Issue 3 On January 20, 1948, the Pennsylvania Bottle Company's carton storage building No. 8 at Sheffield, Pennsylvania, together with the machinery and cartons therein, was destroyed by fire. Between March 4, 1948, and March 26, 1948, the Pennsylvania Bottle Company received checks, totalling $83,987.02, *124 from fire insurance companies on account of this and other property of the petitioner destroyed or damaged by the fire. Of this amount, $27,331.38 was allocable to building No. 8. The checks from the fire insurance companies were deposited in the regular bank account of the Pennsylvania Bottle Company at the Warren National Bank. On four occasions between March 31, 1948, and December 31, 1948, the regular bank account of the Pennsylvania Bottle Company at the Warren National Bank was overdrawn. When the checks totalling $83,987.02 were received from the fire insurance companies, a "Fire Loss Reserve" in that amount was established on the books of the Pennsylvania Bottle Company. During April 1948 the "Fire Loss Reserve" account was debited with $83,987.02 and the same amount was credited, in the aggregate, to 38 separate reserve accounts for the replacement or repair of the destroyed or damaged property. During April 1948 the Pennsylvania Bottle Company spent $56,655.64 in replacing the destroyed cartons and machinery, in repairing damaged machinery and in cleaning up debris caused by the fire. The respondent has not taxed any part of this $56,655.64. On April 30, 1948, only *125 four out of the 38 reserve accounts originally established for the replacement of the property destroyed or damaged by fire remained on the books of the Pennsylvania Bottle Company. These four reserve accounts had the following credit balances: Reserve for construction No. 8 build-
ing
$25,956.00
Reserve for repair of brick wall
948.00
Reserve for wiring No. 8 building
397.50
Reserve for lighting fixture No. 8
building
29.88
Total
$27,331.38
Some time during 1948, the Pennsylvania Bottle Company reduced the "Reserve for Construction #8 Building" by $10,934.71 and credited the same amount to the "Plant Buildings" account. The balance in the four reserve accounts, $16,396.67, remained until the actual costs of replacement were debited to those accounts. When it filed its 1948 income tax return, the Pennsylvania Bottle Company requested permission from the Commissioner to establish a replacement fund under section 112 (f) of the Code. Permission was granted, and the petitioner was given until March 15, 1950, to account for any gain. The Pennsylvania Bottle Company filed a surety bond in the amount of $38,000, which was double the estimated additional taxes *126 which would have been payable if such permission had not been granted. In September 1949 the Pennsylvania Bottle Company began to restore building No. 8. By February 28, 1950, it had expended $17,527.27 in excess of the $27,331.38 received from the fire insurance companies and allocable to building No. 8 in the restoration process. The net operating loss allowed the Pennsylvania Bottle Company by the respondent for the taxable year 1946 was $62,064.13, determined as follows: Net loss for 1948 as disclosed in return
$90,402.36
Less: Gain from involuntary conversion
$26,867.55
Other adjustments
1,470.68
28,338.23
Net operating loss deduction
$62,064.13
The "Gain from involuntary conversion" in the amount of $26,867.55, indicated in the preceding paragraph, was determined by the respondent as follows: Total insurance proceeds
$83,987.02
Less: Proceeds expended for replace-
ments
56,655.64
27,331.38
Less: Basis of building No. 8
463.83
Gain from involuntary conversion
$26,867.55
As a result of this inclusion of $26,867.55 in gross income in the year 1948, the Pennsylvania Bottle Company's net operating loss for that year, *127 allowable as a carry-back to the year 1946, was reduced by the same amount. This reduction in turn reduced the unused excess profits tax credit allowable as a carry-back from 1946 to the taxable year 1945. Opinion LEMIRE, Judge: The first issue presents the question whether the amounts received by the respective petitioners in 1945, pursuant to a settlement with Hartford, constitutes ordinary income as determined by the respondent. Petitioners concede that the amount received by Lincoln was taxable as ordinary income. The contentions made with respect to the other petitioners is that the amounts received in 1945 were payments in compromise of claims asserted under the Sherman and Clayton antitrust laws for treble damages. Petitioners made no showing of the amounts of actual damages suffered. They argue that one-third of the payments made represent capital gain and two-thirds punitive damages, neither of which amounts are includible in determining net income for excess profits tax purposes. The respondent relies upon the cases of Tygart Valley Glass Co., 16 T.C. 941, and Buck Glass Co. v. Hofferbert, 176 Fed. (2d) 250. The taxpayer involved in each of *128 those cases received proportional payments under the identical settlement agreement with Hartford here in question. Our findings of fact in the instant proceeding parallel those found in the Tygart case. The contentions of the respective parties there made are in substance the same as those advanced here. In fact, counsel appearing for the petitioners represented the taxpayer in the Tygart case. The opinion meets and disposes of such contentions with logic and clarity. We cannot constructively elaborate thereon, but can only repeat. Since, in our opinion, the controlling facts in the case at bar are not readily distinguishable from those presented in the Tygart case, we conclude our decision there is controlling here. Departure from precedent is to be justified only upon substantial grounds. The petitioners attempt to distinguish the Tygart case on the ground that it is based on a finding of fact that the licensees of Hartford had compromised a common claim for a return of royalties, which finding was without support in the record. We do not agree. It is apparent the decision was premised upon the over-all picture as disclosed by the record. The petitioners also attempt to distinguish *129 the Buck case on the ground that the taxpayer made no claim for a return of royalties paid to Hartford. The point made is without significance. As stated in the Tygart case, the question presented is the nature for tax purposes of an amount received in settlement. We think the rationale of the Tygart and Buck cases coincides. Petitioners further argue that we should accept the testimony of Arnold R. Boyd, counsel for petitioners, to the effect that the only claim asserted against Hartford was a claim for treble damages under the antitrust laws and that it made no claim for a return of royalties. In the Tygart case its general counsel testified similarly. In commenting on such testimony, the opinion states: * * * "Such testimony is not conclusive. We may not rely on it alone to decide the point, but must consider the payment of the amount here in question in the light of all the circumstances and determine the motive behind the payment." * * * Furthermore, in the instant case, Roger M. Elred, a vice president of Hartford, who attended all the meetings between Hartford and the industry committee negotiating the settlement, testified he had no knowledge that the Knox group, the *130 petitioners herein, asserted a special claim against Hartford, but that their objection was to executing a general release to Hartford, which was modified by the execution of a covenant not to sue. He further testified that Hartford did not offer Knox any settlement on any terms different from the terms offered to the rest of the industry. In our opinion the record supports the fact that the settlement involved a royalty refund claim with as much consistency as it supports the fact that the settlement involved a claim for damages. Even if we assume for the purpose of argument that the Knox group asserted a special claim, we think it is clear that there was no meeting of the minds of the parties on the settlement of such a claim. Boyd admitted on cross-examination that he knew of no agreement other than the one submitted to the court. In its final decree the court directed a return of 60 per cent of the funds held by the receiver which had been set aside and earmarked as having been paid in by each licensee less certain expense items. We sustain the respondent's determination that the payments received in the taxable year 1945 under the settlement with Hartford constitute ordinary *131 income in that year. The petitioners, except Lincoln, in the alternative, contend that in the event it is held that the petitioners received taxable income through the settlement with Hartford the amount received by each should be allocated under section 721 (a) (2) (A) to each of the years in the period 1932 to 1945 in proportion to the royalties paid by each petitioner [3] to Hartford in each of such years. It has been stipulated that during the period 1941 to 1944, inclusive, the petitioners, excluding Lincoln, received no income from a claim, award, judgment or decree, or from interest on any of the foregoing within the meaning of section 721 (a) (2) (A) of the Internal Revenue Code. The respondent on brief concedes if his position that the amounts recovered under the settlement agreement were payments of claims for the return of rents and royalties, that the six petitioners, excluding Lincoln, received net abnormal income in 1945 attributable to the taxable years 1942 through 1945. The controversy revolves around the question whether the amounts of such abnormal income should be allocated to *132 any of the years prior to 1942, as contended by the petitioners. Upon this record we find no basis in fact or logic for allocating the settlement payments received in 1945 to any year prior to the year 1942. It is obvious that the payments involved the rents and royalties paid by the six petitioners to the receiver appointed in the Government's antitrust suit against Hartford and its codefendants. There is no evidence of any claim or demand by the six petitioners for rents and royalties paid to Hartford prior to the receivership. Since we have held that the real basis of the settlement was the royalty refund claims which involved the earmarked funds paid to the receiver in the years 1942 to 1945, inclusive, the relief which the six petitioners are entitled to under section 721 of the Code is to be limited to such period as conceded by the respondent. The amount which each petitioner is entitled to allocate in those years will be determined under Rule 50. The final question presented is whether the gain realized by the Pennsylvania Bottle Company from an involuntary conversion is entitled to nonrecognition under section 112 (f) of the Internal Revenue Code *133 . All of the facts pertaining to this issue have been stipulated. The respondent contends that the petitioner, Pennsylvania, is not entitled to the benefits of section 112 (f), as amended by section 151 (d) and (e), Revenue Act of 1942, since it has failed (a) to trace the conversion proceeds into the property acquired by replacement; (b) has not shown a replacement fund was established; or (c) that the replacement property was acquired "forthwith." The petitioner contends that it has complied with the provisions of statute and regulations so as to entitle it to the benefits of section 112 (f). It points out that the statute provides that the proceeds from an involuntary conversion may be expended in the establishment of a replacement fund; that it made application for and was granted permission to establish a replacement fund and complied with all of the provisions of section 112 (f) of the Code [4] and the Regulations promulgated pursuant thereto. Secs. 29.112 (f)-1 and 2. [5] Petitioner further argues that section 29.112 (f)-1 of the Regulations, requiring the tracing of the proceeds, speaks only of a "condemnation award," and that section 29.112 (f)-2, dealing with replacement *134 funds, contains no requirement that the proceeds from an involuntary conversion be traced into a replacement fund and from there into the property replaced or repaired. *135 The courts have uniformly held that to be entitled to the benefits of section 112 (f) of the Code it is incumbent upon the taxpayer to show that the proceeds from a compulsory or involuntary conversion, whether it occurs through a condemnation award or the payment of insurance after a fire loss, have been actually used to replace similar property. Ovider Realty Co. v. Commissioner, 193 Fed. (2d) 266, affirming a memorandum opinion entered May 10, 1951 [10 TCM 433]; Kennebec Box & Lumber Co. v. Commissioner, 168 Fed. (2d) 646, affirming a memorandum opinion entered May 19, 1947 [6 TCM 544]; Winter Realty & Construction Co., 2 T.C. 38, modified 149 Fed. (2d) 567, certiorari denied, 326 U.S. 754; Frischkorn Development Co., 30 B.T.A. 8, affd. 88 Fed. (2d) 1009. While the establishment of a replacement fund and compliance with the provisions of section 29.112 (f)-2 of the Regulations were not directly involved in the above-cited cases, we think that, regardless of the character of the compulsory or involuntary conversion, it is incumbent upon the taxpayer to trace *136 the proceeds into the property replaced. The petitioner makes no contention, on brief, that it has met the tracing requirement, and upon that ground alone the respondent's determination should be sustained. However, in our opinion, there is more substantial basis for denying to the petitioner the benefits of section 112 (f) of the Code. The stipulated facts do not show that a replacement fund was established. When the petitioner in April 1948 received the insurance proceeds they were deposited in the petitioner's regular bank account. On at least three occasions during the year 1948 the account was overdrawn. The record does not disclose the nature of the expenditures leading to the exhaustion of the regular account. Since the building destroyed by fire was not replaced until late in 1949, it is fair to assume that the withdrawals were used for general business purposes. The record does establish that the petitioner did set up a reserve account on its books and charged against such reserve the expenditures made to replace the building destroyed. In the case of Winter Realty & Construction Co., supra, at page 52, we said: * * * "The setting up on the liability side *137 of its ledger of a reserve account called "Replacement Fund" in the amounts set out in our findings is not in itself the establishment of a replacement fund. Cf. M. J. Caldbeck Corporation, 36 B.T.A. 452, 456. Such an account does not reflect the investment of money in the establishment of a fund. The taxpayer must invest the money in assets which have been designated in some way as being held for replacement purposes. This was not done in the instant proceedings. We are unable to find among the petitioner's assets any account representing a separate fund set apart from the other assets to be used only for the purpose of replacing the property that was condemned." * * * On appeal, the United States Court of Appeals for the Second Circuit affirmed this Court with respect to this issue. The above-quoted language is particularly appropriate to the facts presented in the instant case, and is adopted as setting forth the rule governing the establishment of a replacement fund. While in the case at bar the petitioner was granted permission to establish a replacement fund, whereas in the Winter case, supra, such authorization was not obtained, we do not regard such facts *138 as furnishing a sound basis for distinguishing the two cases. In our opinion, mere permission to establish a replacement fund is no proof of the actual establishment of such a fund, as provided for by section 112 (f) of the Code. We hold that the facts here stipulated are insufficient to show that a replacement fund was in fact established, and on the authority of the Winter case, supra, we sustain the respondent's determination that the petitioner is not entitled to nonrecognition of the gain realized in the year 1948 on the involuntary conversion of its property under section 112 (f) of the Internal Revenue Code. There being other issues remaining for trial in Docket No. 37292 that case is restored to the general calendar at Pittsburgh, Pennsylvania, for trial in due course. Decisions will be entered under Rule 50 in Docket Nos. 33323, 33437, 33475, 33476, 33477. and 35755. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Oil City Glass Bottle Company; Wightman Bottle & Glass Mfg. Co.; Marienville Glass Company; Pennsylvania Bottle Company; Knox Glass Bottle Company; and Lincoln Glass Bottle Company.↩
2. The respective petitioners will hereinafter be referred to as "Knox of Pennsylvania," "Oil City," "Wightman," "Marienville," "Pennsylvania," 'Knox of Mississippi," and "Lincoln."↩
3. Lincoln did not claim relief under section 721↩.
4. Section 112(f) of the Code, as amended, so far as material here reads as follows: SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(f) Involuntary Conversion. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - (1) Conversion into similar property. - Into property similar or related in service or use to the property so converted, no gain shall be recognized. (2) Conversion into money where disposition occurred prior to 1951. - Into money, and the disposition of the converted property occurred before January 1, 1951, no gain shall be recognized if such money is forthwith in good faith, under regulations prescribed by the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund. If any part of the money is not so expended, the gain shall be recognized to the extent of the money which is not so expended (regardless of whether such money is received in one or more taxable years and regardless of whether or not the money which is not so expended constitutes gain). For the purposes of this paragraph and paragraph (3), the term "disposition of the converted property" means the destruction, theft, seizure, requisition, or condemnation of the converted property, or the sale or exchange of such property under threat or imminence of requisition or condemnation. ↩
5. Regulations 111, sections 29.112(f)-1 and 2, pertinent here provides: Sec. 29.112(f)-1. Reinvestment of Proceeds of Involuntary Conversion. - Upon the involuntary conversion of property described in section 112(f), no gain is recognized if the provisions of that section are complied with. If any part of the money received as a result of such an involuntary conversion is not expended in the manner provided in section 112(f), the gain, if any, is recognized to the extent of the money which is not so expended. * * *
In order to avail himself of the benefits of section 112(f) it is not sufficient for the taxpayer to show that subsequent to the receipt of money from a condemnation award he purchased other property similar or related in use. The taxpayer must trace the proceeds of the award into the payments for the property so purchased. It is not necessary that the proceeds be earmarked, but the taxpayer must be able to prove that the same were actually reinvested in such other property similar or related in use to the property converted. The benefits of section 112(f) cannot be extended to a taxpayer who does not purchase other property similar or related in service or use, notwithstanding the fact that there was no other such property available for purchase. * * *
Section 29.112(f)-2. Replacement Funds. - In any case where the taxpayer elects to replace or restore the converted property but it is not practicable to do so immediately (for example, because of the taxpayer's inability to obtain priorities, or because of other wartime restrictions), he may obtain permission to establish a replacement fund in his accounts in which part or all of the compensation so received shall be held, without deduction for the payment of any mortgage. In such case the taxpayer should make application to the Commissioner on Form 1114 for permission to establish such a replacement fund, and in his application should recite all the facts relating to the transaction and declare that he will proceed as expeditiously as possible to replace or restore such property. The taxpayer will be required to furnish a bond with such surety as the Commissioner may require in an amount not in excess of double the estimated additional income taxes which would be payable if no replacement fund were established. * * *↩